ROCCO LO RUSSO, Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (North Shore Cement, Inc., Appellant).—NORTH SHORE CEMENT, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Rocco Lo Russo, Appellant.)

First District (Industrial Commission Division)   Nos. 1—93—0265WC, 1—93—0266WC cons.

Opinion filed February 4, 1994.

60

McCULLOUGH, P.J., joined by SLATER, J., dissenting.

Vito D. DeCarlo, of Ganan & Shapiro, P.C., of Chicago, for appellant.

Cuda & LaPonte, Ltd., of Chicago, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Rocco Lo Russo, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 138.1 *et seq.*). Therein he alleged injuries to his lower back arising out of and in the course of his employment with the employer (North Shore Cement, Inc.). Claimant filed a petition for immediate hearing, pursuant to section 19(b—1) of the Act. Ill. Rev. Stat. 1987, ch. 48, par. 138.19(b—1).

On April 8, 1988, the arbitrator found that, as a result of accidental injuries arising out of and in the course of his employment of July 9, 1987, claimant was temporarily totally disabled for a period of $38^3/7$ weeks and was entitled to reasonable and necessary medical expenses. On August 8, 1988, the Industrial Commission (Commission) affirmed the decision of the arbitrator. This decision was not appealed by the employer.

Claimant filed a second section 19(b—1) petition on February 1, 1990. The arbitrator found that evidence of treatment for injuries sustained by claimant in a December 11, 1987, automobile accident was not submitted at the first section 19(b—1) hearing and that these documents were relevant to the issue of causation and admissible at the second section 19(b—1) hearing. The exhibits were admitted over claimant's objection. The employer's exhibit 1 consisted of Dr. Belisario Arias' records, which made reference to claimant's car accident of December 11, 1987. Exhibit 2 is a January 8, 1988, report from River Grove/Melrose Park Clinic, which stated that claimant had increased pain due to a car accident. Exhibit 3 is a November 11, 1989, report from the Melrose Park Clinic; it merely refers to the subject accident. The arbitrator relied on these exhibits in finding that claimant failed to prove there was a causal connection between his inability to return to work and the accidental injury of July 9, 1987. The arbitrator denied additional compensation or reimbursement of medical expenses. Claimant appealed the arbitrator's decision.

On June 4, 1990, the Commission affirmed and adopted the arbitrator's decision. Claimant appealed this decision to the circuit court, and, on February 15, 1991, the trial court found that the doctrine of collateral estoppel barred the introduction of the employer's exhibits 1, 2 and 3, because they could have been offered at the first section 19(b—1) hearing.

The trial court directed the Commission to make a new decision on claimant's eligibility for temporary total disability (TTD) compensation, excluding the employer's exhibits 1, 2 and 3 from its consideration. The Commission, after considering the entire record without the excluded exhibits, found that claimant was temporarily totally disabled for a period of $51^6/7$ weeks between February 17, 1989, and February 15, 1990, that his condition of ill-being was causally related to the July 9, 1987, accident, and that he was entitled to reasonable and necessary medical expenses. The circuit court confirmed this decision, and employer made a timely appeal.

On appeal, the employer raises two issues, namely, (1) whether the circuit court erred in ruling that exhibits 1 through 3 were barred by collateral estoppel, and (2) whether the Commission's decision upon remand was against the manifest weight of the evidence.

## FIRST SECTION 19(b—1) HEARING

The first arbitration hearing was held on February 22 and April 8, 1988. Nicola D'Alesio testified through an interpreter that, on July 9, 1987, claimant and he worked at a site near Belmont and Central in Chicago, Illinois. Claimant complained of back pain after they tried to lift a heavy concrete slab with a 2 by 4. Mr. D'Alesio was

present on July 10, 1987, when claimant informed foreman Vincent Battista about the injury. Mr. D'Alesio stated that Mr. Battista suggested that claimant seek medical care.

Phillip Rubino, president of North Shore Cement, Inc., stated that Vincent Battista was claimant's crew foreman on July 9, 1987, and that Mr. Battista was in Italy at the time of the arbitration hearing. He acknowledged it was possible that the company was performing work at Belmont and Central in July 1987. Mr. Rubino agreed that claimant was performing cement finishing duties during that month. He was unable to verify whether claimant was on the pouring crew at the Belmont site on July 9, 1987. Claimant notified Mr. Rubino of a work-related injury after he had been off work a few days. Mr. Rubino instructed claimant to get medical help. He denied suggesting that claimant pursue a claim under the union's insurance plan.

Claimant testified with the aid of an interpreter. On July 9, 1987, he was 26 years old and worked for the employer as an assistant cement finisher. Nicola D'Alesio, a co-worker, and claimant were using a 2 by 4 to lift a concrete slab that weighed between 50 to 100 pounds. Claimant stated that Vincent Battista, his supervisor, was present. Claimant noticed a pain in his lower back that traveled into his left leg, but he continued working. After about 15 minutes, claimant experienced increased discomfort and began to walk in a stooped manner. Claimant sat down and informed Mr. Battista about his injury and pain. Mr. Battista criticized him for walking "crooked" and told claimant that there was nothing wrong with him.

Claimant went home, took a hot bath and applied Ben Gay to his back. He continued performing his duties through July 14, 1987, but reduced his lifting activities due to recurrent back pain. On July 15, 1987, claimant went to the emergency room of Resurrection Hospital, where he gave Dr. Zimmer a history of a work-related injury with an immediate onset of pain in his back and left leg. Dr. Zimmer had X rays taken and prescribed medication. Claimant returned to work the next day and continued working until July 27, 1987. Claimant's complaints of back and left leg pain persisted.

On July 28, 1987, claimant went to Dr. Stephen Pruni, a licensed chiropractor. At this examination, claimant accomplished right leg raising to 30 degrees in supine and sitting positions. Claimant had positive Braggards and Valsalva maneuvers, which indicated a disc lesion. Dr. Pruni attributed the positive Goldthwait and Bechter's signs to disc involvement. Claimant experienced problems getting in and out of his chair and had a positive Mineris sign. Dr. Pruni checked claimant's deep tendon reflexes and noted decreased strength

and sensation, especially on the left. Heel/toe walking was also positive on the left. Dr. Pruni found severe back spasm and recommended that claimant undergo diagnostic tests. He subsequently diagnosed an L5-S1 disc herniation and treated claimant three times a week with manual traction, low voltage galvanism, hot/moist packs and trigger point physical therapy to the spine.

Dr. Per Freitag, an orthopedic surgeon, evaluated claimant on August 4, 1987, at the request of Dr. Pruni. The same day, Dr. Freitag admitted claimant to John F. Kennedy Medical Center, where he received conservative care and underwent further tests. Dr. Freitag agreed with Dr. Pruni's diagnosis of a left L5-S1 herniated disc with left radiculopathy. Since claimant's symptoms were not alleviated by conservative treatment, Dr. Freitag recommended that claimant undergo an L5-S1 microlumbar diskectomy. He concluded that claimant's back condition was causally related to the July 9, 1987, accident and that it was permanent in nature. On August 10, 1987, Dr. Freitag discharged claimant, restricted him from working and prescribed analgesics and muscle relaxants.

Dr. Pruni, who did not consider claimant capable of working, continued to provide him with chiropractic care through October 1987. There was never any significant improvement of his back during this period. Dr. Pruni testified, based upon a reasonable degree of medical and surgical certainty, that the July 9, 1987, work injury caused claimant's L5-S1 herniation.

Dr. Belisario A. Arias, a neurosurgeon, first examined claimant on October 22, 1987. Claimant gave him a history of back pain beginning on July 9, 1987. Dr. Arias found positive straight leg raising on the left with restricted range of motion of the lumbar spine. Claimant limped and had an antalgic gait. On October 23, 1987, Dr. Arias admitted claimant to Westlake Hospital for a lumbar MRI and myelogram, which confirmed a left L5-S1 extruded disc with degenerative disc disease. Dr. Arias subsequently performed a left L5-S1 hemilumbar laminectomy and foraminotomy with a resection. He provided claimant with follow-up care after his October 30, 1987, discharge. Dr. Arias instructed claimant to remain in bed and prescribed medication and physical therapy. He readmitted claimant on November 12, 1987, for debridement and secondary closure of the lumbosacral wound that had become infected and partially opened.

A November 14, 1987, CT scan of claimant's lumbar spine revealed that the L5-S1 herniated disc had not been completely removed. Specifically, Dr. B. Yoon, a radiologist reviewing the CT scan, wrote:

"There is obliteration of the left anterior and lateral epidural recess at the level of the L5-S1 intervertebral disc. The finding is most likely due to a herniated disc between the L5-S1 intervertebral disc space on the left side. There is also evidence of a partial laminectomy at the left side of L5 lamina. A similar finding was present in previous study of October 23, 1987.

IMPRESSION: Herniated disc at L5-S1 intervertebral disc space, more pronounced on the left side. Partial laminectomy is also noted."

Claimant testified that he was involved in a car accident on December 11, 1987.

On cross-examination, the following dialogue took place:

"Q. On December 11, 1987, were you involved in an automobile accident?

A. Yes.

Q. And were you with your wife and someone else at that time?

A. Yes.

Q. And after that accident did you see Dr. Pruni?

A. No.

Q. Have you seen any doctor after that accident on December 11, 1987?

A. My own doctor.

Q. And who is that?

A. Arias.

Q. Did you tell him you were in an automobile accident?

A. Yes.

Q. Did he give you any treatment for it?

A. He suggested that I take x-rays.

Q. Did you take the x-rays?

A. Yes.

Q. What part of you did you take the x-rays?

* * *

A. Underneath where [I] had the operation, below where he [sic] had the operation.

Q. Where did you have those x-rays taken?

A. Gottlieb Hospital.

* * *

Q. Other than getting the x-ray taken, did you get any kind of treatment after this automobile accident?

A. Not for the accident, but for the shoulder, yes.

A. Who's giving you treatment on the shoulder?

A. Not on the shoulder but on the spine, as before."

On redirect examination, the claimant testified thusly:

"Q. You did have an auto accident on December 11, 1987?

A. Yes.

Q. And you received some immediate treatment for that injury?
A. No.
Q. You did have x-rays done of the back?
A. Yes.
Q. And after that injury did you notice anything different about your back?
A. The same as before.
THE ARBITRATOR: Rocco, did you hurt yourself from this automobile accident? Were you hurt at all by it?
THE WITNESS: No.
THE ARBITRATOR: A lot of people get in automobile accidents and they're not hurt, you know."

A letter dated February 18, 1988, from Dr. Arias to the employer's attorney was admitted into evidence. Therein, Dr. Arias stated:

"Mr. LoRusso has been followed very closely in our office. The patient did report that on November 11, 1987, he was involved in an automobile accident, and some of his symptoms had recurred.
\* \* \*
ADDENDUM: February 19, 1988
The patient has today given us a written statement and emergency room documentation from Gottlieb Hospital that the date of the accident was December 11, 1987 not November 11, 1987 as our records showed."

At the February 22 portion of the first arbitration hearing, the employer's attorney was asked by the arbitrator if the case was going to be completed that day. The employer's attorney responded, "I think we're going to have to take some deps [sic]." Dr. Steven Pruni, claimant's chiropractor, was deposed on March 18, 1988. His deposition was admitted into evidence on April 8, 1988. Dr. Arias was not deposed, nor were any of his records requested by the employer prior to the closing of proofs.

## SECOND SECTION 19(b—1) HEARING

At the second arbitration hearing held on December 14, 1990, the following evidence was adduced. Claimant testified that he continued to experience pain in his lower back and left leg. This discomfort substantially increased after physical activity. He received physiotherapy once a month and saw Dr. Arias twice a month. He swam and exercised at the Spa Health Club in accordance with Dr. Arias' orders. He denied having worked for anyone since July 18, 1987. At this second hearing, claimant was asked no questions regarding the December 11, 1987, accident.

At claimant's request, Dr. David Demorest, of the River Grove/ Melrose Park Clinic, examined him on January 8, 1988. Claimant complained of left sciatic pain that traveled into his left leg. Dr. Demorest found straight leg raising on the left positive at 70 degrees

and diminished left ankle jerk reflexes. Muscle spasm was also found in claimant's lower back. Dr. Demorest restricted claimant from working and prescribed medication and physical therapy. Dr. Demorest continued to see claimant once a month, but his symptoms of pain and radiculopathy persisted.

Dr. Arias reexamined claimant on February 11, 1988. He found positive straight leg raising on the left between 45 degrees and 50 degrees. There was mild to moderate restriction of motion in claimant's lumbar spine. This limitation was especially noticeable on flexion. Claimant's left ankle reflexes were absent. Dr. Arias opined that claimant's L5-S1 herniated disc had been treated successfully by surgery and that his current complaints were due to the December 1987 car accident. He recommended physical therapy for his current complaints.

In April 1988, Dr. Demorest discontinued physiotherapy because claimant's complaints of pain in his back and leg did not diminish. He suggested that claimant use heat, rest and perform no work. Claimant subsequently experienced increased symptoms as the weather got warmer. On August 17, 1988, Dr. Demorest ordered an MRI of claimant's lumbar spine, which revealed a small, central left L5-S1 herniated disc.

In a November 27, 1988, letter to the employer's insurance company, Dr. Arias, who saw claimant throughout 1988, stated in relevant part:

"In response to your letter of November 2, 1988, [claimant] had clinical findings as well as x-ray studies of an extruded disc of the left L5-S1 and the surgical procedure was performed in October 1987. The patient developed a superficial infection which was treated by debridement and secondary closure. Progress was quite satisfactory.

[Claimant] presented in the office on December 17, 1987 with the history that he was involved in a motor vehicle accident on [December] 11, 1987. He described driving his car when he was severely hit on the rear. His body jerked backwards and forwards and at the same time he had a twisting movement of his body. His symptoms of low back pain and left leg pain recurred with severity.

\* \* \*

I am quite positive that this second accident (when he was in the early phase of postsurgical state) aggravated his previous condition. I have repeatedly discussed with [claimant] my recommendation that he consider a second surgical procedure to remove a fragment which apparently is pressing on the root at the L5-S1 level.

I sincerely doubt that physical therapy or vocational rehabilitation will improve his condition when his functional capacity is limited due to the above findings. I strongly feel he will require a second procedure. Delay hampers total recovery as was expected with his first surgery."

This letter served as the basis for the employer's termination of TTD benefits in February 1989.

Dr. Demorest noted that claimant's subjective complaints remained the same throughout 1988. A December 1988 lumbar MRI revealed that claimant's left L5-S1 disc herniation had worsened during the four months since the last MRI. Dr. Demorest concluded that claimant was not capable of working. In January 1989, he referred claimant to Dr. Alfred Akkeron for an orthopedic consultation.

Dr. Akkeron examined claimant on February 3, 1989, and found positive straight leg raising at 25 degrees on the left. Claimant favored his left leg and had a slow gait. Dr. Akkeron reviewed his previous medical records and opined that claimant's current symptoms were due to disc material pressing on the L5-S1 nerve root and were not attributable to the December 11, 1987, accident.

In his February 6, 1989, letter to Dr. Demorest, Dr. Akkeron wrote:

"I also note that he was in an automobile accident on December 11, 1987, and I do not feel that the automobile accident has caused any change in his disc appearance since the disc appeared in an MRI taken after the accident is almost exactly the same as it was prior to the accident. *** I feel that present disc problem has been present prior to his automobile accident and it is due to disc material at L5-S1 level on left side."

Dr. Akkeron then estimated that claimant would have a success rate of 50% to 60% if he underwent a repeat lumbar laminectomy and excision. He acknowledged that this procedure would be difficult because of existing scar tissue and other possible complications. Dr. Akkeron considered it the only option he could provide.

Dr. Demorest saw claimant on February 24, 1989, and noted he was angry and upset. Dr. Demorest prescribed vocational rehabilitation and pain management therapy and continued the "no work" restriction. He wrote the employer concerning the causation and extent of claimant's disability but had received no reply.

The parties stipulated that on February 28, 1989, the employer wrote claimant and advised him that it was terminating his TTD benefits, relying on Dr. Arias' opinion that the December 11, 1987, auto accident was the cause of claimant's current condition.

Claimant was nervous, depressed and short tempered in the last quarter of 1989. He attributed these feelings to his personal and financial problems, which he believed were related to the July 9, 1987, injury. In October 1989, Dr. Demorest diagnosed postlaminectomy syndrome and depression and referred claimant to Leyden Township Family Services (LTFS) for psychological counseling. Claimant attempted to get assistance from LTFS but was unable to pay for these services. Dr. Demorest observed that, while claimant's physical and emotional symptoms were about the same, he seemed agitated about the delay in the proceeding of his worker's compensation claim.

Dr. Arias considered claimant to be disabled from working as of December 1, 1989, and issued a disability slip with restriction.

At the second arbitration hearing, the employer presented the three exhibits discussed above. Claimant objected to the admission of these exhibits on the basis that these records were in large part available prior to the first section 19(b—1) hearing but the employer failed to introduce them. The arbitrator overruled this objection. Based upon these exhibits, the arbitrator concluded that the December 11, 1987, accident broke the chain of causation and denied TTD benefits. As noted above, the Commission adopted and affirmed the arbitrator's denial of TTD. On review, the circuit court found the exhibits were barred by collateral estoppel and remanded the cause to the Commission to consider the evidence without said exhibits.

On remand, the Commission, relying on *Owens v. Industrial Comm'n* (1990), 203 Ill. App. 3d 818, 551 N.E.2d 147, determined that the doctrine of collateral estoppel barred the admission of the employer's exhibits 1 through 3.

In dealing with the threshold issue of causation, the Commission wrote:

> "[The employer] maintains that the December 11, 1987 auto accident broke the causal connection between [claimant's] current back problems and the July 9, 1987 work injury. [Employer's exhibits 1 through 3] were admitted at the February 15, 1990 [arbitration] hearing on [claimant's] second 19(b—1) Petition. These exhibits dealt with causation issues that were resolved at the first § 19(b—1) hearing and were available at that time. [The employer] was a party to proceedings involving both § 19(b—1) Petitions and the issue of causation in the first hearing is identical to the one raised in the last trial. Since [the employer] did not appeal the causation of [claimant's] back impairment after the first decision, by the Arbitrator, the [employer] is now unable to pursue the theory in the subsequent § 19(b—1) case.

The Commission finds that these records are excluded from consideration and that the [employer] is collaterally estopped from arguing that the December 11, 1987 auto accident was an intervening cause.

\* \* \*

The Commission relies on the opinions of Dr. Demorest and Dr. Akkeron concerning the issue of causation. Both physicians agreed that [claimant's] current complaints were due to a left L5-S1 disc herniation that had not been completely removed by the laminectomy. This condition was confirmed by a November 1987 lumbar MRI. Neither doctor attributed the present condition of [claimant's] lumbar spine to the December 11, 1987, auto accident. [Claimant's] condition remained the same before and after the December 11, 1987 car accident. The Commission notes that there is conflict between the opinions of Dr. Demorest and Akkeron and the conclusions of Dr. Arias about why [claimant's] symptoms still persisted. The Commission places more weight on the findings of the current medical providers than [claimant's] operating neurosurgeon on the causation issue. Dr. Arias, the surgeon who performed the unsuccessful surgery, has a stake in defending his work which taints his opinion, in this Commission's view."

The Commission found that claimant was temporarily totally disabled for an additional period of $51^6/_7$ weeks between February 17, 1989, and February 15, 1990, and was entitled to reasonable and necessary medical expenses.

First, we address the employer's argument that the circuit court erred in finding that the employer's exhibits 1 through 3 were barred by collateral estoppel. The employer contends that this issue of claimant's December 11, 1987, automobile accident as it related to causal connection was not litigated and determined in the first section 19(b—1) hearing. In response, claimant asserts that the issue of the effects of the subject automobile accident was fully before the arbitrator at the first section 19(b—1) hearing. Thus, claimant maintains that the issue of causation was fully addressed in the first proceeding and could not be relitigated in the second proceeding.

In *Owens v. Industrial Comm'n* (1990), 203 Ill. App. 3d 818, a case involving collateral estoppel, this court wrote:

"The doctrine applies where a prior judgment in a different action prevents relitigation of a fact issue determined on the merits in that prior action. [Citation.] The necessary elements of collateral estoppel are that the issue of fact decided in the first case is identical to the issue raised in the present action; that there was a final judgment on the merits in the first case; that the party against whom the estoppel is asserted was a party, or in privity

with a party, in the prior action; and that the factual issue was actually and necessarily litigated and determined in the first case." *Owens*, 203 Ill. App. 3d at 821.

The question before us is essentially this: did the employer have a full opportunity in the first arbitration hearing to address the issue of whether the December 11, 1987, accident broke the causal connection between claimant's work-related accident and his subsequent condition of ill-being?

■ Prior to the first portion of the first arbitration hearing held on February 22, 1988, employer's counsel received a letter from Dr. Arias, indicating that the auto accident had caused some of claimant's back symptoms to recur. Thus, the employer was aware that Dr. Arias might well have concluded that the accident was a break in the causal connection chain. Yet the employer did not depose Dr. Arias, even though it had more than sufficient time to do so. Moreover, even assuming *arguendo* that the employer did not have sufficient time to request Dr. Arias' record and/or depose him, it could have moved for an extension of time before closing proof. The Act states in relevant part:

> "If at the [section 19(b—1)] hearing, material information is *** disclosed, the Arbitrator may extend the time for closing proof on the motion of a party for a reasonable period of time which may be more than 30 days." (Ill. Rev. Stat. 1987, ch. 48, par. 138.19(b—1)(xiii).)

The employer made no such motion for extending the time for closing proof.

Furthermore, as described above, claimant was cross-examined in some detail regarding the accident during the February 22 hearing. Claimant stated that X rays were taken of his lower back following the accident. Thus, the employer was made further aware that Dr. Arias and possibly other providers had records which might be relevant to the issue of causal connection. Instead of pursuing further evidence which might bolster its case, the employer failed to put forth the requisite effort. The employer made little use of the month and a half that passed between the time it was fully aware that claimant had been in a possibly relevant automobile accident and the time proofs were closed on April 8, 1988.

Under this record, we find that the issue of whether the December 11, 1987, accident broke the chain of causation was litigated in the first arbitration proceeding. The failure to deal more specifically with this issue is the employer's responsibility. The circuit court correctly decided that the doctrine of collateral estoppel prevented the employer from raising this issue in the second section 19(b—1) proceeding.

The employer's final argument is that the Commission's decision was against the manifest weight of the evidence. As we have often stated, it is the Commission's province to resolve any conflicts in the medical evidence. (*Yaeger v. Industrial Comm'n* (1992), 232 Ill. App. 3d 936.) The Commission's decision will not be set aside on review unless it is against the manifest weight of the evidence. *Lenhart Tool & Die Co. v. Industrial Comm'n* (1992), 232 Ill. App. 3d 693.

■ The evidence clearly supports the Commission's determination. A CT scan taken on November 14, 1987, showed conclusively that claimant still had a herniated disc at L5-S1. Dr. Demorest took issue with Dr. Arias' conclusion that claimant's continuing back problems were related to the December 11, 1987, car accident. Dr. Demorest noted, "[claimant's] records revealed on October 23, 1987, a herniated nucleus pulposus at the L5-S1 level on the left and that [a] CT scan approximately three weeks post surgery on November 14, 1987, revealed the same abnormality. I indicated to [claimant] that it is my personal feeling that not all of the disc was removed [in the October 24, 1987, surgical procedure]."

Dr. Akkeron also found that the tests taken of claimant's lower back demonstrated that the herniation at L5-S1 had not been corrected by the initial surgery performed by Dr. Arias. Additionally, Dr. B. Yoon in reading the November 14, 1987, CT scan, taken after the first surgery, noted that there was still a herniated disc at L5-S1.

This medical evidence substantially outweighs Dr. Arias' opinion that the December 11, 1987, accident aggravated claimant's lower back condition. His opinion does not address the results of the November 1987 CT scan, which the three above-cited physicians interpreted as demonstrating an L5-S1 herniation. As such, his opinion carries little weight.

Accordingly, we find that the Commission's award of TTD benefits is not against the manifest weight of the evidence.

For reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

RAKOWSKI and RARICK, JJ., concur.

PRESIDING JUSTICE McCULLOUGH, dissenting:

The factual background as set forth by the majority shows a previous section 19(b—1) petition having been filed December 28, 1987. The claimant in this first petition alleged that he had ordered the records of the medical providers and would provide them prior to

the hearing. At the time of this first section 19(b—1) hearing, claimant provided the records of Dr. Arias which contained the doctor's notes through December 3, 1987, which was the last visit prior to claimant's automobile accident of December 11, 1987.

As the arbitrator points out in his decision:

"The only document which mentioned the automobile accident was a letter to the petitioner's attorney dated February 18, 1988, which was, therefore, issued subsequent to the time the respondent was allowed to respond to the [section] 19(b—1) petition."

Section 19(b—1) allowed the respondent only 15 days from the filing date, December 20, 1987, to January 4, 1988, to respond.

The arbitrator's decision on the second section 19(b—1) petition also shows:

"The 19(b—1) petition, filed on December 28, 1987, did not list the River Grove and Melrose Park Clinics as medical facilities where the petitioner had been treated. In fact, the petitioner was not seen at these clinics until January, 1988. As such, the respondent would have had no opportunity to present these records at the initial [section] 19(b—1) hearing."

As the arbitrator noted, respondent had the right to rely upon claimant's assertion that he had the complete records of Dr. Arias.

The arbitrator also found:

"The record is clear that the petitioner did not submit the full records of Dr. Arias at the first [section] 19(b—1) hearing. The records of the River Grove and Melrose Park Clinics could not have been placed into evidence since the petitioner did not receive treatment at those facilities until after the [section] 19(b—1) petition was filed."

A review of the arbitrator's award on the first petition and the Commission's specific findings and confirmation of the first award do not even mention the December 11, 1987, accident. How can this be collateral estoppel?

It is interesting to note, both section 19(b—1) petitions were heard by the same arbitrator.

*Owens* is cited with respect to the application of collateral estoppel. *Owens* requires that "the issue of fact decided in the first case is identical to the issue raised in the present action." (*Owens*, 203 Ill. App. 3d at 821, 561 N.E.2d at 149.) As stated above, there was no determination of whether there was an intervening accident. Neither the first award nor first decision even mentions the accident of December 11, 1987, or its effect upon claimant's application. For the same reasons, there was no judgment on the merits on the effect of the intervening accident. The factual issue was not "actually and necessarily litigated."

In defending its position, the majority presupposes that the arbitrator would have found good cause to extend the time for closing proofs at the first hearing. As argued by the respondent, section 19(b—1) proceedings are specific as to the contents of the petition and the response. Such petitions request immediate relief and deal only with temporary disability. "No award may be entered for permanent [partial] disability ***." (Ill. Rev. Stat. 1987, ch. 48, par. 138.19(b—1).) There has been no determination of whether the intervening accident should bar further recovery.

SLATER, J., joins this dissent.